IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 18-00009-01-CR-W-RK |
| ) | |
| JONATHAN M. BRAVO-LOPEZ, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Jonathan M. Bravo-Lopez's Motion to Suppress (Doc. #118). For the reasons set forth below, it is recommended that this motion be denied.

I. BACKGROUND

On January 30, 2018, the Grand Jury returned an Indictment against defendants Jonathan M. Bravo-Lopez, Juan D. Osorio, and Marco A. Sosa-Perea. On February 25, 2020, the Grand Jury returned a five-count Superseding Indictment against defendants Bravo-Lopez, Osorio, and Sosa-Perea.[1] Defendant Bravo-Lopez is charged in four counts of the Superseding Indictment (Count One—Conspiracy to Commit Kidnapping, Count Two—Kidnapping Resulting in Death, Count Three—Using a Firearm to Commit Murder,[2] and Count Five—Unlawful Re-Entry).

An evidentiary hearing on defendant Bravo-Lopez's motion to suppress was held on September 27, 2022. Defendant Bravo-Lopez was represented by appointed counsel Thomas H.

---

[1] Defendant Sosa-Perea entered a guilty plea on January 4, 2022.

[2] The government has filed a Motion to Dismiss Count Three of the Superseding Indictment (Doc. #170).

Johnson. The Government was represented by Assistant United States Attorney Patrick Edwards. The Government called Sergeant Erica Oldham[3] and Detective Brad Thomas of the Kansas City, Missouri Police Department as witnesses. The defense called Dr. Antolin Llorente to testify.

## II. FINDINGS OF FACT

On the basis of the evidence presented at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. The morning of April 4, 2017, Detective Erica Oldham became involved in the investigation of the kidnapping of C.E., which kidnapping had occurred on April 3. (Tr. at 8.) The lead detective on the case was Brad Thomas. (Tr. at 8-9; 86.) Detective Oldham testified that she and other detectives were briefed as to what had happened the night before and spent that day and the next reviewing surveillance videos throughout the city, fielding tips from the public, serving search warrants, and interviewing witnesses. (Tr. at 9-10.) Detective Oldham testified that she had a good understanding of the general state of the investigation and the information obtained by other detectives. (Tr. at 10.)

2. Jonathan Bravo-Lopez was arrested at 7:45 p.m. on April 5, 2017, following a search of his residence, and taken to police headquarters. (Tr. at 10-11, 38; Gov. Exh. 2 at 2.) Bravo-Lopez was taken to an interview room, unhandcuffed, and left alone for approximately four hours. (Tr. at 12, 15, 38, 88.) Bravo-Lopez later told the detectives that he had napped for those four hours. (Tr. at 21; Gov. Exh. 1c at 22:45.) Detective Oldham explained the delay as follows:

   > This case was rapidly evolving by the minute, actually, and we had had a couple of witnesses that had responded to one of our side stations to give a statement in regard to their knowledge. And they were transported to police headquarters as well, right around the same time that evening, and we were interviewing them.

   (Tr. at 12.) The witnesses who Detective Oldham was interviewing prior to her interview of Bravo-Lopez provided information that Oldham would use in her interview of Bravo-Lopez. (Tr. at 10.) Detective Oldham testified that Bravo-Lopez was not left waiting in the interview room for four hours with the objective of increasing his anxiety. (Tr. at 38.)

---

[3]During the time period relevant to this hearing, Sergeant Oldham was a detective with the Kansas City, Missouri Police Department. (Tr. at 86.) She will be referred to as Detective Oldham in the recitation of facts.

2

Case 4:18-cr-00009-RK    Document 178    Filed 11/17/22    Page 2 of 15

3. Detective Thomas testified that prior to the interview with defendant Bravo-Lopez, the detectives knew that C.E. had been abducted at gunpoint. (Tr. at 86.) Detective Oldham testified: "There was [a] sense of urgency with this case in finding the victim. And our number one goal with this interview was to locate the victim, as well as whatever Mr. Bravo-Lopez knew about the case." (Tr. at 14.) Detective Thomas testified that in talking to Bravo-Lopez, he was hoping to obtain a confession and locate the body of the victim. (Tr. at 88-89.) Detectives Oldham and Thomas entered the interview room shortly after midnight. (Tr. at 14.)

4. Before the interview began, defendant Bravo-Lopez was offered the opportunity to use the restroom, but he declined. (Tr. at 15; Gov. Exh. 1b at 00:16.)

5. Detective Thomas read defendant Bravo-Lopez the following rights verbatim from a Miranda Warning and Waiver form:

   1. You have the right to remain silent.
   2. Anything you say can and will be used against you in a court of law.
   3. You have the right to talk to a lawyer and have him/her present with you while you are being questioned.
   4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish.
   5. You can decide at any time to exercise these rights and not answer any questions or make any statements.

   (Tr. at 17, 94-95; Gov. Exh. 1b at 01:32; Gov. Exh. 2 at 1.) Detective Thomas asked Bravo-Lopez if he understood the rights and wanted to talk. (Tr. at 17, 95; Gov. Exh. 1b at 01:54.) Bravo-Lopez stated that he wanted to talk. (Tr. at 95; Gov. Exh. 1b at 01:57.) Bravo-Lopez was handed the Miranda Warning and Waiver form and signed the form. (Tr. at 17, 77; Gov. Exh. 1b at 02:04; Gov. Exh. 2.) Bravo-Lopez had the opportunity to read the form when it was handed to him. (Tr. at 77-78.) Detective Thomas testified that when he asks someone if they understand the *Miranda* waiver and if they are willing to talk to him, he takes them at their word. (Tr. at 128.)

6. Detection Thomas handed a DNA consent form to defendant Bravo-Lopez. (Tr. at 15-16, 96; Gov. Exh. 1b at 02:57.) Detectives Oldham and Thomas testified that Bravo-Lopez appeared to read the Consent to Search form which he then signed. (Tr. at 15-16, 18, 98; Gov. Exh. 1b at 03:14 and 03:49; Gov. Exh. 3.) As Detective Oldham was filling in the rest of the form, there was some confusion as to the defendant's middle and last names. (Tr. at 53-55.) Detective Oldham did not find this odd because she has seen similar confusion when asking other Hispanic people with hyphenated names about their middle and last names. (Tr. at 55.)

3

7. For purposes of the Detective Investigative Report ("DIR") (which asks for pedigree information), Detective Thomas asked defendant Bravo-Lopez for his social security number, which Bravo-Lopez did not know. (Tr. at 18, 56-57, 78.) Detective Oldham testified that she did not find it unusual that Bravo-Lopez did not know his social security number because she has seen this before. (Tr. at 57.) Bravo-Lopez was unable to provide his mother's address, where he had lived for a time. (Tr. at 59.) Bravo-Lopez was unable to provide his father's phone number. (Tr. at 61.) Bravo-Lopez was also unable to provide the address and phone number of his children's mother. (Tr. at 59-60.) Detective Oldham testified that this was not unusual as she has experienced many times where persons interviewed are asked these questions and they do not know phone numbers and addresses of relatives. (Tr. at 59-60, 62.) Detective Thomas testified that Bravo-Lopez's inability to answer these questions did not raise any concerns with him. (Tr. at 118.) There was some confusion as to whether Bravo-Lopez was divorced, but Detective Oldham testified that it did not raise any suspicion with her and the detectives did not follow up on Bravo-Lopez's marital status. (Tr. at 60-61.) Detectives Oldham and Thomas testified that the DIR is typically completed after a defendant has waived his *Miranda* rights because the DIR questions could be viewed as guilt-seeking questions. (Tr. at 78-79, 95-96.)

8. After the Miranda Warning and Waiver form, the DNA consent form, and the DIR were completed, the detectives began to talk to defendant Bravo-Lopez about the circumstances of C.E.'s disappearance. (Tr. at 18-19.) At this point, C.E.'s body had not been found. (Tr. at 19.) Detective Oldham testified that prior to beginning the interview, she did not detect any impairment in defendant Bravo-Lopez's ability to communicate with the detectives and Bravo-Lopez had not requested a Spanish-English interpreter. (Tr. at 19.) Detective Oldham testified that she did not feel that Bravo-Lopez had comprehension issues. (Tr. at 62, 78.) Detective Oldham did not believe that Bravo-Lopez's responses to the background questions were indications of low intelligence. (Tr. at 73.)

9. Throughout the interview, defendant Bravo-Lopez's version of the events of April 3 changed. (Tr. at 20, 91.) Initially, Bravo-Lopez denied knowing C.E., but stated that he had seen him around. (Tr. at 21; Gov. Exh. 1c at 01:11.) Bravo-Lopez next stated that he had last seen C.E. eight days ago, when he purchased weed from him. (Gov. Exh. 1c at 01:27, 02:49.) Eventually, Bravo-Lopez admitted that he was present in the car with Juan Osorio, Marco Sosa-Perea and C.E. (Tr. at 90.)

10. Detectives Oldham and Thomas testified that they used various interrogation tactics (telling defendant Bravo-Lopez that they knew he was not the bad guy and that he was in a really good position, presenting false information that Marco Sosa-Perea had been arrested in Houston and the detectives were flying there later

4

that day to interview him, talking about Bravo-Lopez and Sosa-Perea being in a race to the finish line, and presenting false information about the use of facial recognition technology) to put pressure on Bravo-Lopez to tell the truth. (Tr. at 22-24, 32, 65-68, 89, 118-19.) Detectives Oldham and Thomas testified that while it was implied that it would be better for Bravo-Lopez if he won the race, the detectives did not make any promises of favorable treatment or what would happen after the interview. (Tr. at 81, 83, 99, 120.)

11. At one point, Detective Thomas accused defendant Bravo-Lopez of shooting C.E. and Bravo-Lopez said, "I wouldn't do that, that's not me." (Tr. at 122.) Detective Thomas responded, "Johnathan wouldn't do that, but Shadow [a name that Bravo-Lopez said he had gone by in the past] would." (Tr. at 122-24.) Detective Thomas testified that he made this statement to give Bravo-Lopez the opportunity to take an out; not to imply that Bravo-Lopez had an identity disorder. (Tr. at 124-25.)

12. Detectives Oldham and Thomas took defendant Bravo-Lopez out of the interview room to drive around and attempt to locate C.E.'s body. (Tr. at 27; Gov. Exh. 1j.) Upon their return, Bravo-Lopez was asked if he was okay to continue the interview and he responded that he was. (Tr. at 28; Gov. Exh. 1k.)

13. Throughout the interview, defendant Bravo-Lopez was offered and accepted water, snacks, and restroom breaks. (Tr. at 16, 20, 21, 32, 92; Gov. Exh. 1b at 10:28; Gov. Exh. 1d; Gov. Exh. 1f at 01:28; Gov. Exh. 1g; Gov. Exh. 1h; Gov. Exh. 1i; Gov. Exh. 1k; Gov. Exh. 1l.)

14. Detectives Oldham and Thomas testified that during the time they spent with defendant Bravo-Lopez in both the interview room and driving around attempting to locate C.E.'s body, Bravo-Lopez never expressed that he wanted to stop the interview and never said anything about being too tired to continue. (Tr. at 32-33, 92.) If Bravo-Lopez had stated that he did not want to talk anymore or asked for an attorney, Detective Oldham testified that she would have ended the interview. (Tr. at 77.) Detective Oldham testified that there was never a time where she was concerned that Bravo-Lopez could not understand the questions the detectives were asking. (Tr. at 33.) Detectives Oldham and Thomas testified that Bravo-Lopez was responsive throughout the interview and that he communicated throughout the entirety of the interview in English, never switching to Spanish. (Tr. at 33, 92-93.) Detectives Oldham and Thomas testified that Bravo-Lopez never requested an interpreter and never asked that he be interviewed in Spanish. (Tr. at 33, 92.) Detectives Oldham and Thomas testified that they never thought that an interpreter was necessary based on their communication with Bravo-Lopez. (Tr. at 33, 93.) Detective Thomas testified:

5

> [A]s the interview progressed, if had I gotten the inkling that Mr. Bravo-Lopez did not speak proficient English, we would have regrouped. That absolutely was not the case.

(Tr. at 108.) When asked to write on various photographs during the interview, Bravo-Lopez wrote in legible English. (Tr. at 34, 93.) Defendant Oldham testified that Bravo-Lopez did not appear to be under the influence of marijuana. (Tr. at 80.)

15. Detective Oldham testified that based on her experience in other interviews and in this interview in particular, there was nothing about defendant Bravo-Lopez that caused her to think he might have some sort of mental disease or defect. (Tr. at 35.) Detective Thomas testified that he was never under the impression that Bravo-Lopez was a low-functioning person or that he had some sort of mental disability or defect. (Tr. at 126, 128-29.) Detective Thomas further testified as follows:

    > I never had any indication at any point during our interview that I thought Mr. Bravo-Lopez was not able to make [an] intelligent statement. He never struck me as dysfunctional or slow or incompetent.

    (Tr. at 127.) Detective Oldham believes that Bravo-Lopez's story changed over the course of the interview because he was originally lying and modified the story as he found out information that the detectives already knew and that Bravo-Lopez had been trying to withhold. (Tr. at 35.) Detective Thomas testified that he believed that Bravo-Lopez changed his story based on "[t]he introduction of new tidbits of information that we would feed him." (Tr. at 91.)

16. Detective Thomas testified that he has had no training with regard to individuals having mental diseases or defects. (Tr. at 93.) Detective Thomas further testified that he has had no specialized training with regard to neuro-psychology or the interaction between an individual's mental state and his ability to waive *Miranda* rights. (Tr. at 93.) When confronted with the question that while it is not suggested that he is an expert in the area of intellectual disability, does he, as a police officer, have an obligation to determine whether a person truly understands and is waiving his rights, Detective Thomas responded:

    > You know, I guess the best answer I have is, I'll just reiterate, that at no point during my interaction with Mr. Bravo-Lopez did I ever feel that he was not able to provide [an] intelligent statement, and that at no point did I ever feel that he didn't understand anything, ever.

(Tr. at 130.)

17. The interview ended with Detective Thomas asking defendant Bravo-Lopez, "Do you want to look into this camera and explain to the prosecutor why you had to kill Chops?" and Bravo-Lopez responding, "I didn't shot Chop, man." (Def. Exh. 206 at 299.)

18. Dr. Antolin Llorente, a neuro-psychologist, has examined defendant Bravo-Lopez. (Tr. at 135.) Dr. Llorente testified that Bravo-Lopez exhibits significant deficits in intellectual abilities, as well as memory problems and problems with his emotional well-being. (Tr. at 136.) Dr. Llorente testified that Bravo-Lopez also exhibited executive functioning deficits, such as issues with planning, inhibition, and other higher order cognitive abilities. (Tr. at 136.) While Dr. Llorente would not label Bravo-Lopez as an intellectually disabled individual, he would place him in the borderline range. (Tr. at 138-39, 174.)

19. Dr. Llorente testified that there are studies which find that individuals with intellectual abilities in the borderline range, like defendant Bravo-Lopez, do not understand *Miranda* warnings. (Tr. at 139-42.) Dr. Llorente testified that Bravo-Lopez's understanding would also be impaired by his memory issues. (Tr. at 152.) It is Dr. Llorente's opinion that Bravo-Lopez did not understand the *Miranda* warnings read to him by Detective Thomas. (Tr. at 142-43.) Given his opinion that Bravo-Lopez could not understand *Miranda* warnings, Dr. Llorente further opined that Bravo-Lopez could not voluntarily, knowingly, and intelligently waive those rights. (Tr. at 154.) "[T]he nature of the right that he has abandoned and the consequences of abandoning such a right . . . are very abstract concepts for people who have these types of intellectual difficulties to understand." (Tr. at 154.)

20. Dr. Llorente testified that defendant Bravo-Lopez "may have attended the ninth grade, but he never completed the ninth grade." (Tr. at 145.) Dr. Llorente found that Bravo-Lopez's level of reading in English is at a second-grade level with his level of reading understanding perhaps even lower. (Tr. at 145.) Given Bravo-Lopez's reading level, it is Dr. Llorente's opinion that if Bravo-Lopez read the DNA consent form, he would not have been able to understand it. (Tr. at 145.) Dr. Llorente testified that if Bravo-Lopez had been instructed to read the form out loud, "perhaps [Detective Thomas] could have surmised that [Bravo-Lopez] may have had difficulties in understanding this form that he was signing." (Tr. at 146.)

21. Dr. Llorente testified that there were signs that detectives should have picked up on which demonstrated defendant Bravo-Lopez's deficits. (Tr. at 146-47.) Such signs included the fact that the detectives completed the forms for Bravo-Lopez, asking only that he sign; Bravo-Lopez's confusion regarding whether he had a middle initial; Bravo-Lopez's statement that he had black eyes; Bravo-Lopez did

7

not know his social security number; Bravo-Lopez stated he was born in Mexico City when he was actually born in Guerrero, Mexico; and Bravo-Lopez stated that he was divorced when he was merely separated because he had never actually been married. (Tr. at 147-49.)

22. Dr. Llorente testified that individuals with lower intellectual abilities are more susceptible to suggestion or influence by the police interrogating them. (Tr. at 149-50.) Dr. Llorente further testified that individuals with lower intellectual abilities are more likely to change their stories or answers when mild disapproval is given during an interrogation. (Tr. at 151.)

23. Dr. Llorente testified that fatigue and the fact that defendant Bravo-Lopez was isolated for four hours before the interrogation started might have affected Bravo-Lopez more than it would have affected an individual with higher intellectual abilities. (Tr. at 152.)

24. With respect to the deception tactics used by Detectives Thomas and Oldham, Dr. Llorente testified that deception plays a more significant role with a person who has lower intellectual abilities. (Tr. at 153.)

25. The following exchange took place during Dr. Llorente's cross-examination:

> Q. And so, you took all of those things, the two evaluations, the -- all the history you have of his family, all the CoreCivic records, it took all of what we just discussed in order for you to come to this conclusion that's contained in the report that he is of borderline intellect, and then combined with the results from some legal studies that, therefore, he's functionally intellectually disabled or the equivalent of such and can't understand *Miranda*, is that right?
>
> A. No, that's not correct.
>
> Q. Okay. What do I have wrong?
>
> A. You're leaving -- well, many things, Counselor. You're leaving my experience of close to 30 years of evaluating people with intellectual disabilities, people with borderline intellectual functioning, that have, you know, also look at the scientific literature in other areas. So, it's not just those issues. The totality of the evidence or my judgment why he has borderline intellectual functioning is also based on the history that he has that could explain why he could have borderline intellectual functioning. It's also based on the fact that this is an individual who suffered from severe mental illness which CoreCivic had treated for many years.

8

> So, all those factors play a role in my decision as to whether he understands *Miranda* or not. And all of it, Counselor, is supported by peer-reviewed literature.
>
> Q. Would you expect that the average or even the above average police detective or investigator would be able to come to the same conclusion that you came to?
>
> A. I do not know the answer to that, Counselor.

(Tr. at 175-76.)

## III. DISCUSSION

Defendant Bravo-Lopez seeks to suppress the statements he made to law enforcement officers on April 6, 2017. (Motion to Suppress at 1; Doc. #118.) Defendant Bravo-Lopez argues that officers obtained these statements in violation of his *Miranda* rights. (*Id.*)

"The basic rule of *Miranda* is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning." *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). *Miranda* warnings are necessary because "the inherently coercive nature of custodial interrogation blurs the line between voluntary and involuntary statements." *United States v. Diaz*, 736 F.3d 1143, 1148 (8th Cir. 2013) (citations omitted). *Miranda* is triggered when a suspect is (1) interrogated (2) while in custody. *Griffin*, 922 F.2d at 1347. There does not appear to be any dispute that defendant Bravo-Lopez was interrogated while in custody. Thus, the issue before the Court is whether defendant Bravo-Lopez knowingly and voluntarily waived his *Miranda* rights.

"A waiver of the Fifth Amendment privilege against self-incrimination is valid if the waiver is made voluntarily, knowingly and intelligently." *United States v. Gaddy*, 532 F.3d 783,

9

788 (8th Cir. 2008) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). The Eighth Circuit Court of Appeals has provided the following guidance in assessing a defendant's claim that statements to law enforcement must be suppressed because a *Miranda* waiver was not voluntary, knowing, and intelligent:

> There are "two distinct dimensions" to the inquiry whether a suspect's waiver of his *Miranda* rights was voluntary, knowing, and intelligent. *Moran v. Burbine*, 475 U.S. 412, 421 . . . (1986). First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* Second, the suspect must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* We consider the totality of the circumstances in determining whether a suspect's waiver is valid. *Id.*

*United States v. Gayekpar*, 678 F.3d 629, 638 (8th Cir.), *cert. denied*, 568 U.S. 921 (2012). *Accord United States v. Vinton*, 631 F.3d 476, 483 (8th Cir.), *cert. denied*, 565 U.S. 866 (2011). "The government has the burden of proving the validity of the *Miranda* waiver by a preponderance of the evidence." *United States v. Haggard*, 368 F.3d 1020, 1024 (8th Cir. 2004).

Looking at the two dimensions to the inquiry whether defendant Bravo-Lopez's waiver of his *Miranda* rights was voluntary, knowing, and intelligent, the Court notes first that evidence was presented at the hearing that while Bravo-Lopez waited in an interview room for approximately four hours prior to the commencement of the interview, he was not in handcuffs and later told the detectives that he had napped during that time. (Fact No. 2.) The Court credits the testimony of Detective Oldham that Bravo-Lopez was not left waiting in the interview room with the objective of increasing his anxiety, but rather because the detectives were interviewing other witnesses who had responded at that same time to give statements with regard to their knowledge in this rapidly evolving case. (*Id.*) Prior to asking any substantive questions, Detective Thomas read Bravo-Lopez his *Miranda* rights and then asked Bravo-Lopez if he understood his rights and

10

wanted to talk. (Fact No. 5.) Bravo-Lopez stated that he wanted to talk and signed the Miranda Warning and Waiver form.[4] (*Id.*) No evidence was presented to the Court to suggest that the defendant was intimidated, coerced, or deceived into signing the waiver form.

After he signed the Miranda Warning and Waiver form, defendant Bravo-Lopez was handed a DNA consent form which he appeared to read and then sign. (Fact No. 6.) While there was some confusion as to the defendant's middle and last names, Detective Oldham testified that she did not find this odd because she had seen similar confusion when asking other Hispanic people with hyphenated names about their middle and last names. (*Id.*)

Detective Thomas next asked Bravo-Lopez some questions for purposes of filling out the Detective Investigative Report which Bravo-Lopez was unable to answer, such as his social security number and addresses and telephone numbers for relatives. (Fact No. 7.) While the defense suggests that Bravo-Lopez's answers to these questions should have raised red flags, Detective Oldham testified that she did not find the defendant's answers unusual as she has experienced many times where persons interviewed are asked these questions and they do not know their social security numbers or phone numbers and addresses of relatives. (*Id.*) There was also some confusion about Bravo-Lopez's marital status.[5] (*Id.*) Again, Detective Oldham testified that the defendant's confusion about whether or not he was divorced did not raise any suspicion with her. (*Id.*)

---

[4] "'[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.'" *United States v. Vinton*, 631 F.3d 476, 483-84 (8th Cir. 2011) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984)). *Accord Williams v. Norris*, 576 F.3d 850, 868 (8th Cir. 2009), *cert. denied*, 562 U.S. 1097 (2010).

[5] Dr. Llorente testified that while the defendant told the detectives he was divorced, he was never married to the mother of his children, so he could not have been divorced. (Fact No. 21.)

11

Detective Oldham testified that prior to beginning the interview, she did not detect any impairment in defendant Bravo-Lopez's ability to communicate with the detectives. (Fact No. 8.) Detective Oldham testified further that she did not feel that Bravo-Lopez had comprehension issues. (*Id.*) Finally, Detective Oldham testified that she did not believe that Bravo-Lopez's responses to the background questions were indications of low intelligence. (*Id.*)

The Court rejects defendant Bravo-Lopez's argument that his waiver was not knowing and intelligent because he was intellectually impaired. Dr. Llorente testified that while he would not label Bravo-Lopez as an intellectually disabled individual, he would place him in the borderline range. (Fact No. 18.) The Eighth Circuit has found that persons in the borderline range of intelligence can nonetheless understand and waive *Miranda* rights. *See United States v. Vinton*, 631 F.3d 476, 482-83 (8th Cir.), *cert. denied*, 565 U.S. 866 (2011); *United States v. Turner*, 157 F.3d 552, 555 (8th Cir. 1998); *United States v. Makes Room*, 49 F.3d 410, 415 (8th Cir. 1995). Based on the Court's review of the video, the Court finds that the defendant appeared able to comprehend what was transpiring and to communicate effectively with the detectives.

The Court finds Detective Oldham's testimony credible that there was nothing about defendant Bravo-Lopez that caused her to think he might have some sort of mental disease or defect. (Fact No. 15.) The Court finds Detective Thomas's testimony credible that he was never under the impression that Bravo-Lopez was a low-functioning person or that he had some sort of mental disability or defect. (*Id.*) Finally, the Court finds Detective Thomas's testimony credible when he stated: "at no point during my interaction with Mr. Bravo-Lopez did I ever feel that he was not able to provide [an] intelligent statement, and that at no point did I ever feel that he didn't understand anything, ever." (Fact No. 16.) While Dr. Llorente was of the opinion that

12

Case 4:18-cr-00009-RK   Document 178   Filed 11/17/22   Page 12 of 15

Bravo-Lopez could not understand *Miranda* warnings and that he, therefore, could not voluntarily, knowingly, and intelligently waive those rights (Fact No. 19), Dr. Llorente testified that he came to this conclusion only after performing two evaluations of Bravo-Lopez, having access to Bravo-Lopez's family history and CoreCivic records, and having experience of close to thirty years in evaluating people with borderline intellectual functioning and studying the scientific literature (Fact No. 25). When asked if he would expect a police detective to come to the same conclusion as him (i.e. that Bravo-Lopez could not voluntarily, knowingly, and intelligently waive his *Miranda* rights), Dr. Llorente did not offer an opinion. (Fact No. 25.)

The Court next examines the voluntariness of the interrogation. Throughout the interview, defendant Bravo-Lopez's version of the events of April 3 changed. (Fact No. 9.) While the defense argues that these changes were brought about by the coercive interrogation tactics used by the detectives and the defendant's inability to resist these pressures, the Court finds otherwise. Based on the evidence before the Court, it appears that the defendant's story changed over the course of the interview because the defendant was originally trying to deny any involvement and then modified his story as evidence that the detectives already possessed was presented to him. Rather than presenting as a low-functioning individual, the defendant presented himself as an individual who was being cagey. While the detectives used various interrogation tactics,[6] these tactics did not appear to coerce defendant Bravo-Lopez into making an involuntary statement. For example, when Detective Thomas accused Bravo-Lopez of shooting C.E., Bravo-Lopez said, "I wouldn't do that, that's not me." (Fact No. 11.) The interview ended with Detective Thomas asking, "Do you want to look into this camera and explain to the prosecutor

---

[6]The use of interrogation tactics does not require a finding of coercion. *See United States v. Astello*, 241 F.3d 965, 967 (8th Cir.), *cert. denied*, 533 U.S. 962 (2001); *United States v. Makes Room*, 49 F.3d 410, 415 (8th Cir. 1995).

13

why you had to kill Chops?" and Bravo-Lopez denying culpability by responding, "I didn't shot Chop, man." (Fact No. 17.)

Defendant Bravo-Lopez was advised of his rights and appeared to understand the consequences of committing the crime for which he was being questioned. Throughout the interview, Bravo-Lopez was offered and accepted water, snacks, and restroom breaks. (Fact No. 13.) Bravo-Lopez never expressed that he wanted to stop the interview or that he wanted an attorney. (Fact No. 14.) Bravo-Lopez never said anything about being too tired to continue. (*Id.*) "Though lengthy interrogation, appeals to God and family, and promises of leniency can be coercive, the question is whether the totality of the circumstances demonstrate that [the defendant's] will was overborne by coercion." *Williams v. Norris*, 576 F.3d 850, 868 (8th Cir. 2009), *cert. denied*, 562 U.S. 1097 (2010). Based on the facts presented in this case, the Court sees no indication that Bravo-Lopez's will was overborne. After considering the totality of the circumstances, the Court concludes that defendant Bravo-Lopez voluntarily, knowingly, and intelligently waived his *Miranda* rights. The government has met its burden of proving the validity of the *Miranda* waiver.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Bravo-Lopez's Motion to Suppress (Doc. #118).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and

Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

                                                  */s/ Lajuana M. Counts*
                                                  Lajuana M. Counts
                                                  United States Magistrate Judge